

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 2 2 2020

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JIM HARVEY OPRY,           §
                          §
          Petitioner,      §
                          §
v.                         §      No. 4:19-CV-331-A
                          §
LORIE DAVIS, Director,     §
Texas Department of        §
Criminal Justice,          §
Correctional Institutions  §
Division,                  §
                          §
          Respondent.      §

## MEMORANDUM OPINION
### and
### ORDER

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Jim Harvey Opry, a state prisoner confined in the Correctional institutions Division of the Texas Department of Criminal Justice, against Lorie Davis, director of that division, respondent. After having considered the pleadings, state-court records, and relief sought by petitioner, the court has concluded that the petition should be denied.

### I. BACKGROUND

In March 2015 petitioner was indicted in Tarrant County, Texas, Case No. 1399102D, with one count of murder and one count of manslaughter in the death of Britney Eylar. (SHR[1] 5-6, doc. 9-

_____

[1] "SHR" refers to the record of petitioner's state habeas proceeding in WR-89,107-01.

22.) The indictment also included a deadly-weapon notice, a repeat-offender notice, and a habitual-offender notice. As part of a plea-bargain agreement, petitioner pleaded guilty to manslaughter and elected for a jury to assess punishment. (Id. at 12-16.) On May 5, 2016, following the punishment phase of trial, the jury assessed his punishment at 85 years' confinement. (Id. at 7.) The appellate court affirmed the trial court's judgment and the Texas Court of Criminal Appeals refused petitioner's petition for discretionary review. (Electronic R., doc. 9-8.) Petitioner also filed a state habeas-corpus application challenging his conviction and/or sentence, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (Action Taken, doc. 9-20.)

The evidence at trial reflected that Eylar and petitioner, who were both drug users, had been living together for a short time in petitioner's apartment. They fought frequently. On January 1, 2015, the two were fighting and Eylar called a friend, Brandon Peterson, to pick her up. When Peterson arrived, the two were still fighting and when Eylar was packing her belongings in Peterson's car, petitioner threw an industrialized caulk gun toward the car. The caulk gun hit Eylar in the back of the head, splitting her skull. Peterson insisted that they call 911, but petitioner refused and threatened Peterson, who is African American, that he was "Ace Trey," a member of the Aryan Circle, a

2

violent prison gang with members in prison and in the "free world." Peterson, who was scared, left and made an anonymous call to 911. When law enforcement arrived, petitioner fled. Eylar died eight days later after being removed from life support.

The evidence also reflected that petitioner has an extensive criminal history, beginning as a juvenile, and has been confined in prison for the majority of his adulthood.

In 1994, when petitioner was 18 years old, he pleaded guilty to and was convicted of involuntary manslaughter in Harris County, Texas. The case involved petitioner's accidental shooting of Christie Casanover, a fourteen-year-old girl, in the face with a shotgun, killing her. Petitioner and another person dumped her body in a cement cistern in a rural area, where it was discovered by hunters. Although petitioner received deferred adjudication for the offense, he was later adjudged guilty and sentenced to 10 years' confinement.

In 1993 petitioner pleaded guilty to and was convicted of a prohibited-weapons charge in Harris County, Texas, and was sentenced to 100 days' confinement.

In 1994 petitioner pleaded guilty to and was convicted of aggravated assault with a deadly weapon in Harris County, Texas, and was sentenced to 10 years' confinement.

In 2005 petitioner pleaded guilty to and was convicted of unlawful possession of a firearm by a felon and evading arrest

3

with a motor vehicle in Tarrant County, Texas, and was sentenced to 6 years' and 180 days' confinement, respectively.

And, in 2006 petitioner pleaded guilty to and was convicted of unlawful possession of a firearm by a felon in Hood County, Texas, and was sentenced to 10 years' confinement. (Reporter's R., vol. 6, 116-32, vol. 6, doc. 9-15; Reporter's R., vol. 8,[2] 155-56, 161, 163, 167, 169, 173, 175, 180, doc. 9-18.)

While incarcerated petitioner became of a member of the Aryan Circle in 1999 and remained a member both in and out of prison until 2010 when he allegedly renounced his membership in the gang. (Reporter's R., vol. 6, 111-12, 114-15; Reporter's R., vol. 8, 64-66, doc. 9-19.)

## II.   ISSUES

In six grounds for relief, petitioner claims he received ineffective assistance of counsel. (Pet. 6-7(A), doc. 1.)

## IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as

---

[2]The pagination in the ECF header is used when citing the exhibits volume of the reporter's record.

4

determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011); 28 U.S.C. § 2254(d)(1)-(2). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the petitioner's burden to rebut the presumption of correctness through clear and convincing evidence. 28 U.S.C. § 2254(e)(1). *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000).

Furthermore, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume

5

that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* 138 S. Ct. 1188, 1191-92 (2018).

## V. DISCUSSION

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To successfully state a claim of ineffective assistance of counsel, the petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 687. In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Failure to establish either prong of the *Strickland* test will result in a finding that counsel's performance was constitutionally effective. *Id.* The petitioner bears the burden of proof on both components of the *Strickland* standard. *Id.* at 687.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of § 2254(d)(1).

6

*See Gregory v. Thaler,* 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated the ineffective-assistance claims on the merits, this court must review petitioner's claims under the "doubly deferential" standards of both *Strickland* and § 2254(d). *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011). In such cases, the "pivotal question" for this court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable" or whether the state court's factual determination on which the decision was based was unreasonable in light of the evidence presented in the state-court proceedings. *See Richter,* 562 U.S. at 105; *Wood v. Allen,* 558 U.S. 290, 299 (2010).

Petitioner claims that he received ineffective assistance of trial counsel in the following respects:

(1)   counsel failed to object to the state's admission of extraneous-offense victim-impact testimony;

(2)   counsel failed to object to the victim's grandmother's introduction of the victim's family members to the jury;

(3)   counsel failed to object to photographs of an extraneous-offense crime scene;

(4)   counsel failed to object to prejudicial language regarding petitioner's gang affiliation;

(5)   counsel failed to fully advise petitioner regarding the plea bargain; and

(6)   counsel's cumulative errors resulted in a Sixth Amendment violation.

7

(Pet. 6-7(A), doc. 1.)

Petitioner raised his claims in his state habeas application, which was referred to a magistrate judge for hearing, factual findings, and conclusions of law. (SHR 118, 10.) Toward that end, the magistrate judge ordered affidavits from petitioner's trial counsel Stephanie K. Gonzalez and Mamie Bush Johnson. Ms. Gonzalez, who assisted Ms. Johnson, responded to petitioner's allegations in a lengthy affidavit as follows (any spelling, punctuation and/or grammatical errors are in the original):

> To properly answer [petitioner's] allegations, I tender the following as prologue.
>
> "An anonymous call came into Fort Worth Police dispatch on January 1, 2015 at approximately 2140 hours saying a white female 20-30 years of age, was at 429 Haltom Road with severe head injuries and it was possibly gang related". Officers locate (sic) a cell phone, a woman's purse, and a woman's jacket inside a stack of semi-truck tires that were stack under a bobtail trailer."
>
> The victim was transported to John Peter Smith Hospital where ICU nurse Holly Hatchet advised that the victim, "had an apparent gunshot wound to the top of the back left side of her head" and brain matter was exiting victims head.
>
> FWPD conducted a crime scene search and collected evidence including photos of blood spots. The victim was identified as Britney Eylar. FWPD searched a nearby room of [petitioner] and located victims suitcase containing female clothes and female hygiene items. Search warrants were procured for the victim's cell phone and the cell phone of the [petitioner].
>
> On January 2, 2015, FWPD located and collected a bloody blanket from a pickup truck parked adjacent to

8

the site where victim was located.

On January 12, 2015, FWPD arrested and interviewed [petitioner]. He admitted to throwing a caulk gun and hitting victim in the head during an argument. He then admitted to throwing the caulk gun under semi-truck trailers parked nearby. The investigation led to discovery that the victim communicated with gang members.

Police interviewed a witness who advised he was called by the victim to pick her up at 429 Haltom Road. Upon his arrival he heard the victim yelling with an unseen male. The witness advises he turned around and saw the victim on the ground bleeding.

On January 20, 2015, the *Fort Worth Star-Telegram* published photos of [petitioner] and the victim as well as her cell phone messages citing fear of [petitioner]. The *Fort Worth Star-Telegram* added a "Comment" section where several citizens expressed abhorrence of the incident and the criminal justice system: some readers proposed their own punishment of offenders.

[Petitioner] confessed to throwing a large caulk gun in the direction of the victim. A portion of the caulk gun entered victims head causing blunt force trauma. Victim was transported to the hospital. A few days after the incident, victim was taken off life support and died.

The victim was standing in a parking lot next to an automobile preparing to depart. [Petitioner] stood on the stairs to his 2nd floor apartment. An argument had just occurred between the victim and [petitioner]. The stairs were not enclosed but exposed to the outside. There was quite a distance between the victim and [petitioner]. [Petitioner] is alleged to have thrown a large industrial sized caulk gun loaded with a partially filled tube of caulking material. The path of the caulk gun was in an arc (both outwards and down). All caulk guns have a handle that "rachets" a bar into the tube of caulk forcing it out of the end and onto the working surface to be caulked. The caulk gun is ungainly and designed to be used with two hands. It is not designed as a projectile. It cannot be thrown from a distance with accuracy because the center of gravity cannot be determined (the caulk tube was partially

9

empty — being unable to visualize the contents, one cannot quickly determine its center point). A baseball is aerodynamic and its projected path can be easily determined. In contrast, a partially loaded industrial sized caulk gun is not aerodynamic and its projected path cannot be easily determined.

Given the vast amount of evidence, [petitioner]'s confession, seeming attempts to conceal evidence, criminal history, indicia of gang related activity, publicity and comments from the public voicing feelings of the incident, it was thought best to mitigate the evidence by displacing criminality with "mistake" or "accident." [Petitioner] agreed to this strategy.

### Ground One

Ground One alleges, "Trial counsel was ineffective in failing to object to the States admission of extraneous-offense victim-impact testimony during punishment phase."

RESPONSE: Defendant refers to the televised testimony of Sherry Johnson, mother of a decedent [Christie Casanover] from a prior matter. Lead counsel Mamie Johnson and I conferred at length on the event, police reports, autopsy reports, and manner of conducting effective representation of [petitioner]. We knew derogatory evidence would be admitted but we opined that disproportionate attempts to prevent the admission of the evidence would surely highlight the negativity of the evidence. It was thought best to minimize State evidence by not drawing further attention to the same but proceeding to other evidence that brought an ameliorative light to [petitioner]. Given the sheer volume of evidence to be presented against [petitioner], we weighed its effect versus the cost of numerous objections and incensing the jury.

### Ground Two

Ground Two alleges, "Trial counsel was ineffective in failing to object to the victim's grandmother testifying to victim-impact evidence in sentencing phase of trial." [Petitioner] states Mrs. Eylar's (victim's grandmother) testimony as to the identity of the family members present in the court room was "purely irrelevant and prejudicial".

RESPONSE: Ground Two mirrors Ground One in that [petitioner] complains that victim impact testimony was detrimental to him. In Ground Two, [petitioner], "would concede that perhaps some of her testimony was admissible, but the State went too far in asking Mrs. Eylar to introduce family members to the jury" (seated in the court room). Trial strategy is multifaceted. It includes assessing juror facial expressions, seating positions, mannerisms, time of the day, length between recesses, etc. The State's introduction of family members cannot be forecasted. Any attempt to thwart the testimony via objections, only casts darkness over defendant and his counsel, i.e., "What are they trying to hide?" It is best thought to endure the evidence and move on to the next item and not emphasize the testimony. [Petitioner] fails to recall, we countered prosecution strategy (decedent's family members present on the prosecution side of the court room) when we seated [petitioner's] acquaintances on the defense side of the court room. This "silent" defense tactic was employed and thought better than objections that heighten the impact of State's evidence.

Ground Three

Ground Three alleges, "Trial counsel was ineffective in failing to object to crime-scene photographs of the extraneous offense under Rule 403 TEX. R. EVlD." [Petitioner] states admission of photographs from past offenses was "highly inflammatory prejudicial material which was more prejudicial than it was probative."

RESPONSE: In the extraneous offense, the decedent [Christie Casanover] died when a weapon was discharged accidently. We discussed the Texas Rules of Evidence with [petitioner] in preparation of his defense. We stressed that 404b evidence may be used to show lack of mistake, identification, motive, preparation, etc. We discussed that mitigating the evidence was principle in his defense. Per [petitioner], the extraneous offense was an unfortunate set of circumstances (mistake). In the instant matter, the decedent died from blunt force trauma (decedent had a 6 cm penetration into the brain by an object just over 2 inches). Crime scene photos from both incidents supported the defense theory that the deaths were both accidental. In allowing crime scene photos, we hoped to minimize the ferocity of the

11

trauma in the instant matter and offer the theory of "accidental death." Photos were needed to show the difficulty in predicting velocity, direction and magnitude of the thrown device. [Petitioner] allegedly threw a caulk gun that is not for predicted flight. The photos were required to show [petitioner] could not have predicted the trajectory of the caulk gun; and as in the initial matter, he could not have predicted the weapon discharging towards the decedent. This was principle in his defense and he consented to this strategy.

.   .   .

## Ground Five

Ground Five alleges, "Trial counsel was ineffective in failing to object specifically to [petitioner's] gang affiliation." [Petitioner] advises the State's testimony concerning "white-supremacist group affiliation" was prejudicial and inflamed the jury.

RESPONSE: I cross examined Steve Laird, Carrollton PD Gang Officer. My objection to his putative testimony was timely but overruled. With over fifteen years of trial experience as a prosecutor and defense counsel, I know that stressing a particular object, i.e., gang affiliation, only serves to imprint the issue in the minds of the jurors. Constant objections (with possibility of being overruled) heighten juror distrust of defense counsel and defendant. In other words, I tried to keep Pandora's box closed, but being overruled, the box was opened and any attempt to divert attention from the box may incite the jury and enhance penalty to the defendant. This character evidence was admissible because [petitioner] elected to testify and in doing so placed his credibility at issue. [Petitioner] fails to recall that an ameliorative avenue was employed via proof of his completion of the Texas Department of Corrections Gang Renouncement and Disassociation Program "GRAD". [Petitioner] fails to recall the initial call to Fort Worth PD advised the incident was "gang related" and that a search of the decedent's cell phone indicated she communicated with gang members. The issue of "gangs" was embedded in this case at its inception.

12

## Ground Six

Ground Six alleges, "Trial counsel was ineffective in failing to assist [petitioner] in deciding whether or not to accept a plea bargain." [Petitioner] admits he was offered 45 years imprisonment on the first count of murder but advises he elected to plead to the lesser included manslaughter with the stipulation that he would go to the jury for punishment. [Petitioner] "was under the impression" that if 45 years was offered for the higher offense of murder, "he most certainly could only receive less for a plea deal to manslaughter".

RESPONSE: I was not appointed to this matter at its inception. Ms. Mamie Johnson sought my assistance and my experience as a retired Police Lieutenant. I was not present at all jail conferences and therefore cannot address how many times counsel advised [petitioner] of the States offer. When introduced to this matter and later to [petitioner], I distinctly recall he rejected the offer of 45 years and elected to go before the jury for punishment.

## Ground Seven

Ground Seven alleges, "Cumulative error of trial counsel resulted in a 6th Amendment violation of ineffective assistance of trial counsel." [Petitioner] advises, "Multiple errors may be harmful in their cumulative effect on a defendant even if each error would be harmless standing on its own.

RESPONSE: [Petitioner]'s Ground Seven merely offers a summation of his allegations and a final plea for a new punishment hearing. The *Application for Writ of Haheas Corpus* states, ". . . state concisely every legal ground for your claim that you are being unlawfully restrained, and then briefly summarize the facts supporting each ground."

Ground Seven offers no specific point in the trial (distinguished from the prior six grounds) where defense was allegedly ineffective. During recesses in the trial, I visited [petitioner] in his holdover cell. I explained the process of the hearing and the next anticipated event; he offered no new information and seemed satisfied with the defense theory and representation.

13

<u>Summation</u>

I was privileged to serve as second chair counsel to the Honorable Mamie Johnson. Given her experience I knew the matter was well managed. I have twenty-three years experience as a Police Officer, Detective, Sergeant, and Lieutenant. I have over three years experience as a prosecutor and as of 2016 (the year of the trial), fifteen years experience as a defense attorney. Given the severity of the offense and the nature of its commission, it has been my experience that juries routinely receive damning evidence with thoughts of punishment; they often overlook Constitutional rights examined at the outset of trial. Our discussions with [petitioner] included our knowledge of prosecutors and their trial habits, as well as our knowledge of the trial judge and his characteristics in trial, and the Tarrant County political atmosphere affecting jury selection and jury demeanor. [Petitioner] was afforded a well-thought defense plan and steps were implemented to mitigate harm to [petitioner] that included detailed interpretation of the Code of Criminal Procedure and the Texas Rules of Evidence that may not be entirely understandable by laypersons. [Petitioner] agreed with the defense theory.

(SHR 71-81, doc. 9-22 (emphasis in original) (record citations omitted).)

Ms. Johnson responded to petitioner's allegations in an affidavit as follows (any spelling, punctuation and/or grammatical errors are in the original):

**Ground One:**

**[PETITIONER] COMPLAINS THAT DEFENSE COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT TO THE STATE'S ADMISSION OF EXTRANEOUS-OFFENSE VICTIM-IMPACT TESTIMONY DURING PUNISHMENT PHASE.**

I was not ineffective by not objecting to the testimony of Sherry Johnson and the impact it had upon her. I specifically chose not to object as a part of my overall defensive strategy. Counsel is aware and has

14

considered that there is a danger of unfair prejudice
inherent in the introduction of victim impact
testimony. However, counsel concluded that the risk of
contradicting the defensive theory of the case was
greater than any benefit of excluding the testimony.
Also, objections to the naturally flowing statement of
a very sympathetic witness runs the risk of alienating
the jury.

I met with [petitioner] six times before trial and
we discussed repeatedly his version of events and the
defense he desired to put forward. [Petitioner]
insisted every time that Cristie Cassanover's death was
accidental and that he cared for Crisitie Cassanover
and was also a victim of her loss. I was attempting to
show through my client's testimony that he had deep
remorse for both victims and a sense of loss especially
as to Britney Eylar.

The trial court has broad discretion in allowing
even extraneous victim-impact testimony. Therefore, in
my estimation the relationship of the witness to the
victim, the amount of testimony to be elicited, and the
amount of time spent on it did not warrant the risk of
alienating the jury by objecting to very obvious
statements. Of course she misses her daughter; of
course she will not see her through life events. The
testimony that was elicited did not impermissibly
compare the worth of the victim to other individuals
and did little more than make her an individual. Given
this analysis I believe that the testimony would have
been admitted by the trial court over objection,
further casting [petitioner] in a negative light before
the jury. Additionally, minimal amounts of like
testimony have been found to be harmless error. There
is a bright line of error where extraneous crimes are
far different than the one on trial. In the present
case the sheer similarity of the prior conviction made
it likely that the court would find it relevant and
acceptable under 403. Both cases involved females dying
as a result of [petitioner]'s actions.

The extraneous offense that was the basis of
Sherry Johnson's testimony was a conviction and
therefore, the clearly admissible evidence was a far
greater factor than a few obvious statements about how
a mother would miss a daughter. Considering this, I did
not think the impact statements would substantially

15

affect the verdict. I believe it was a legitimate strategy not to object to Sherry Johnson's testimony about her daughter.

**Ground Two:**

[PETITIONER] COMPLAINS THAT WITHOUT OBJECTION FROM DEFENSE COUNSEL, THE STATE ASKED THE VICTIM'S GRANDMOTHER TO INTRODUCE THE VICTIM'S FAMILY MEMBERS TO THE JURY.

I did not fail to object to the introduction of the victim's family members in any way that was prejudicial to my client. Character evidence of the victim in the charged case is admissible. It only rises to the level of impermissibility when the state measures the worth of the victim compared to others instead of merely humanizing the victim and illustrating the harm caused by the defendant.

I did raise an objection that was overruled and concluded further interrupting the testimony ran a substantial risk of alienating the jury and undermining the aforementioned defensive theory. It is unclear from [petitioner]'s complaint exactly what he believes the potential objection should have been. If he means I should have objected to the relevance of the identities of who was sitting in the court room, then I disagree. I believe that would have been confusing to the jury and made it look as though we had something to hide. Also, it was strategically better to allow the State to indicate it had more family members, than to allow the State to call each of them to testify. The impact of three more witnesses testifying to the character and the impact of the victim's death would certainly have had a more substantial impact.

**Ground Three:**

[PETITIONER] COMPLAINS THAT TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTENCE WHEN SHE FAILED TO OBJECT TO CRIME SCENE PICTURES OF EXTRANEOUS ACTS.

I was not ineffective by not objecting to the admission of crime scene photos from the extraneous conviction.

16

The trial court has broad discretion on what it deems admissible. [Petitioner] fails to state why the photos or testimony were unfairly prejudicial. They did accurately depict the events. I did not think that I would win any objections as to the admissibility of the exhibits from the previous trial, since their admissibility was ruled on in the prior case. The jury cannot consider mitigation without hearing any facts of the previous crime. It was important for them to hear that [petitioner] was young and that the previous fact pattern involved more stupidity than malice, as we stressed throughout the trial. Further, it is contradictory to continually object and then to argue true remorse at punishment.

. . .

**Ground Five:**

**[PETITIONER] COMPLAINS THAT DEFENSE COUNSEL WAS INEFFECTIVE BY FAILING TO MAKE A SPECIFIC OBJECTION TO PREJUDICIAL TESTIMONY REGARDING [PETITIONER]'S GANG AFFILIATION.**

I did not fail to object to the gang affiliation testimony. My second chair objected and was overruled. She did not continue to object because we did not think we could win subsequent objections on the same subject and did not want to frustrate the jury and alienate them with frivolous objections.

I do not believe further objections on the matter would have been in [petitioner]'s best interest as it was more important to our strategy to show remorse and honesty to the jury. When I directed questions during defense case-in-chief, [petitioner] testified that he renounced his gang affiliation by going through Gang Renouncement and the Disassociation Process while in TDC. He also provided evidence of the same by us introducing his Renouncement certificates received. Furthermore, he testified that he was introduced to the prison life at a young age and joined a prison gang merely for protection. Lastly, [petitioner] mentions in his application that his former gang affiliation was a white-supremacist group. He alleges there was no legal justification in the State presenting testimony of white supremacy to the jury, of which five members of the jury were African-American. I totally disagree with

17

[petitioner], as gang affiliation is properly allowed in the punishment phase of trial. If anything, I thought it was a plus that I, his African-American attorney "stood by his side" representing him. I further emphasized to the jury that he was no longer that person who was only in that gang for protection.

**Ground Six:**

**[PETITIONER] COMPLAINS THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL DID NOT FULLY ADVISE [PETITIONER] ON A PLEA BARGAIN, CAUSING [PETITIONER] TO FACE A THREE-DAY SENTENCING PHASE HEARING AND RECEIVING AN EIGHTY-FIVE YEAR SENTENCE.**

I was appointed to represent [petitioner] on February 3, 2015. I reviewed all materials April 14, April 16, Sept. 3 and Sept. 4 (2015). Also Jan. 27-28, 2016. Moreover, Co-counsel and I continued to review evidence regularly in preparation for trial. Over 100 hours were spent on his case. I visited [petitioner] on Feb. 20, 2015, May 27, 2015, Jan. 19, 2016, Jan 27, 2016, April 5, 2016 and April 19, 2016. I wrote him a total of 11 letters concerning his case. We had multiple discussions. [Petitioner] told me he was sorry that Britney Eylar died, as he did not mean to hurt her in any way. He said he knew he would have to do sometime in TDC, but not for murder because it was an accident. He said he would agree to 20-25 years TDC. I asked the ADA for 25 TDC and he said "NO." In fact, I asked the ADA several times for 25 years. He refused each time. I informed [petitioner] about his last offer of 45 years TDC by written letter (dated October 6, 2015). He and I discussed it again in January 2016. I explained that I felt like I could get the ADA to go down to 40 years, but [petitioner] said he would not accept 40. He said he would take his chance at trial. Due to his lengthy prison history, it was going to be an uphill battle no matter what. He knew he was taking a big chance, but decided to plea guilty to manslaughter. I admonished him that he may end up with more than 45 years TDC. I emphasized to [petitioner] and his brother that the only way to know for sure how much time he would end up with, was to accept a plea agreement. However, he was determined to reject 45 years, as well as 40 if I could get it for him.

18

**Ground Seven:**

**[PETITIONER] COMPLAINS THAT THE CUMULATIVE ERROR OF TRIAL COUNSEL RESULTED IN A SIXTH AMENDMENT VIOLATION OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

I was not ineffective on any point or error raised or unraised by [petitioner]. Co-counsel and I had a strategy of trying to prove it really was an accident. We also emphasized he had officially renounced his gang affiliation. He had issues since he was a teenager and was starting to make positive changes later in his life. We sought consideration from the jury, hoping we could convince them that even the prior manslaughter was a childish act, but an accident as well.

<u>SUMMARY</u>

I was not ineffective and performed my duties as counsel to the spirit and letter of the law.

(Id. at 82-87.)

Based on the record and counsel's affidavits, the magistrate judge entered the following factual findings, which although numerous are included to assist the reader and which were later adopted by the state habeas court and the Texas Court of Criminal Appeals:

<u>Extraneous Offense Victim Impact</u>

5.   Sherry Johnson, the mother of [Christie Casanover] the fourteen year-old girl [petitioner] killed in 1992, testified as follows:

> I have not been blessed with any more children, and I love children to death. I'll never have -- I'll never have -- I never got to see Cristie grow up and graduate and have a family of her own. And that's the hardest thing is my life is so empty now. It's the most -- it's the hardest thing that can happen to a parent is to lose their only child. She

19

-- Cristie was my life.

6.  Some of Sherry Johnson's testimony was victim impact testimony.

7.  Ms. Johnson was aware that there was a danger of unfair prejudice inherent in the introduction of the victim impact testimony.

8.  Ms. Johnson concluded that the risk of contradicting the defensive theory was greater than any benefit of excluding the testimony.

9.  Ms. Johnson's defensive strategy was to present through [petitioner]'s testimony that Cristie's death was an accident, that [petitioner] cared for Cristie, and he was also a victim of her loss.

10. Ms. Johnson also did not object to Sherry Johnson's testimony because Ms. Johnson found the testimony to be a "naturally flowing statement of a very sympathetic witness" and objecting risked alienating the jury.

11. Counsel concluded that the best way to minimize the evidence was to not draw further attention to it.

12. Counsel decided that the impact statements of Sherry Johnson would not substantially affect the verdict in light of everything else.

13. Counsel's decision to not object to Sherry Johnson's testimony was the result of reasonable trial strategy.

Victim's Grandmother

14. Counsel objected to this offense's victim's grandmother testifying on the basis that it was not "proper rebuttal" but was overruled.

15. Ms. Johnson decided not to make any additional objections to the grandmother because any objection ran the substantial risk of alienating the jury and undermining the defensive theory.

16. Counsel concluded that the grandmother pointing

20

out the identities of the victim's family members in the audience was strategically better than having the State call each of them individually to testify.

17. Counsel was concerned that the impact of three more witnesses testifying to the victim's character and the impact of the victim's death would have had a more substantial impact on the jury than merely pointing out the additional family members.

18. Counsel's decision not to object to the victim's grandmother pointing out the family members in the audience was the result of reasonable trial strategy.

Extraneous Crime Scene Photographs

19. Photographs of the 1992 crime scene, including images of the dead body, were admitted into evidence without objection.

20. The photographs were not overly gruesome.

21. The photographs were not unfairly prejudicial.

22. The photographs accurately depicted the events.

23. Ms. Johnson concluded that she would not win any objections to the photographs so any objections would be frivolous.

24. Ms. Johnson felt it important for the jury to hear that [petitioner] was young during the first incident and that the previous fact pattern involved more stupidity than malice.

25. Ms. Johnson believed it contradictory to continually object; and then argue true remorse.

26. Counsel's decision not to object to the crime scene photographs from 1992 was the result of reasonable trial strategy.

. . .

Gang Affiliation

29.  Counsel objected to the relevance of the gang
     testimony outside the presence of the jury.

30.  The trial court overruled counsel's objection.

31.  Counsel decided not to continue to object in front
     of the jury because they concluded any objections
     would be frivolous, would only serve to frustrate
     the jury, and would stress the subject matter.

32.  Counsel decided it was more important to their
     strategy to show remorse and honesty to the jury.

33.  Counsel concluded [petitioner]'s gang affiliation
     was admissible because [petitioner] chose to
     testify.

34.  Counsel decided to demonstrate that [petitioner]
     had successfully renounced his gang affiliation
     through the Gang Renouncement and the
     Disassociation Process while in prison.

35.  The evidence at trial was that the victim's death
     may have been gang related and that the victim
     communicated with gang members.

36.  Ms. Johnson concluded that the fact that
     [petitioner] was accused of being a white
     supremacist, and Ms. Johnson is an
     African-American attorney that stood by [him],
     supported the argument that [he] was only in the
     gang for his protection.

37.  Counsel's decision to not continue to object to
     the evidence that [petitioner] was a gang member
     was the result of reasonable trial strategy.

Plea Advice

38.  Counsel wrote [petitioner] a total of eleven
     letters concerning his case.

39.  Counsel and [petitioner] had multiple discussions
     about the case.

40.  [Petitioner] stated that he would agree to a plea

offer of twenty to twenty-five years, but not for
murder.

41. Ms. Johnson approached the State several times for
a twenty-five year plea offer and it was declined
every time.

42. The State's last plea offer was forty-five years.

43. Ms. Johnson advised ]petitioner] that she could
possibly get the State to go down to forty years;
however, [petitioner] would not accept forty
years.

44. Ms. Johnson advised [petitioner] that the jury
would receive evidence about his prior
manslaughter conviction.

45. Ms. Johnson advised [petitioner] that the jury
would learn about [petitioner]'s prior criminal
history.

46. Ms. Johnson advised [petitioner] that a trial
would be a risk due to his lengthy prison history.

47. Ms. Johnson advised [petitioner] that he may end
up with more than forty-five years if he went to
trial.

48. Ms. Johnson advised [petitioner] that the only way
to guarantee a specific sentence was to accept the
plea agreement.

49. Prior to entering his plea, Ms. Johnson reviewed
the written plea admonishments with [petitioner].

50. Ms. Johnson discussed the consequences of his plea
with [petitioner] several times prior to trial.

51. Counsel's advice regarding the State's plea offer
was the result of reasonable trial strategy.

52. Ms. Johnson's affidavit is credible and supported
by the record.

53. Ms. Gonzalez's affidavit is credible and supported
by the record.

54. There is no evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different but for the alleged misconduct.

(Id. at 120-126 (record citations omitted).)

Based on its findings, and applying the *Strickland* standard, the magistrate judge made the following legal conclusions:

10. Counsel's decision to not object to Sherry Johnson's testimony was the result of reasonable trial strategy.

11. Counsel's decision to not to continue to object to the victim's grandmother's testimony was the result of reasonable trial strategy.

12. Counsel's decision to not object to the crime scene photographs from [petitioner]'s 1992 conviction was the result of reasonable trial strategy.

16. Counsel's decision to not continually object to the evidence that [petitioner] was a gang member was the result of reasonable trial strategy.

17. Counsel properly advised [petitioner] about the legal consequences of rejecting the State's plea offer.

18. Counsel properly advised [petitioner] that he faced the full range of punishment if he rejected to the State's offer and pled open to the jury.

19. Counsel properly advised [petitioner] that his prior criminal history, including his prior manslaughter conviction, would be considered by the jury when assessing punishment.

20. [Petitioner] has failed to prove that trial counsel's representation fell below an objective standard of reasonableness.

21. A party fails to carry his burden to prove ineffective assistance of counsel where the probability of a different result absent the

24

alleged deficient conduct "sufficient to undermine confidence in the outcome" is not established.

22. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

23. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel objected to Sherry Johnson's testimony.

24. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel objected to the victim's grandmother's testimony.

25. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel objected to the crime scene photographs from [petitioner]'s 1992 manslaughter case.

.  .  .

27. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel objected to the testimony of [petitioner]'s gang affiliation.

28. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel advised him more about the legal consequences of rejecting the State's plea offer.

29. [Petitioner] has failed to show that there is a reasonable probability that the result of the proceeding would have been different had counsel advised him more about what [petitioner] faced at trial.

25

30. [Petitioner] has failed to show that there is a
    reasonable probability that, but for the alleged
    acts of misconduct, the result of the proceeding
    would have been different.

31. [Petitioner] has failed to prove that he received
    ineffective assistance of trial counsel.

(Id. at 120-29 (citations omitted).)

Petitioner has not presented clear and convincing evidence
to rebut the state court's factual findings. Rather, he argues
that the state courts misconstrued his claims, that the state
courts understated the extent of the unfair prejudice presented
by counsel's errors, and/or that there was no possible legitimate
trial strategy involved in counsel's acts or omissions. (Pet'r's
Mem. 4-17, doc. 2.) However, deferring to the state courts'
factual findings, including the state courts' credibility
determinations, as this court must, the state courts' application
of *Strickland* was not objectively unreasonable. Petitioner's
claims are largely conclusory, with no factual or legal basis,
refuted by the record, involve strategic and tactical decisions
made by counsel, involve state evidentiary rulings or other
matters of state law, and/or would have required counsel to make
futile objections or arguments, all of which generally do not
entitle a state petitioner to federal habeas relief. *See, e.g.,*
*Strickland,* 460 U.S. at 689 (holding strategic decisions by
counsel are virtually unchallengeable and generally do not
provide a basis for postconviction relief on the grounds of

26

ineffective assistance of counsel); *Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011) (providing counsel's decision not to object to adverse witness testimony was not an unreasonable trial strategy when doing so would draw undue attention to that harmful testimony); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make futile motions or objections); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"). Even if petitioner could demonstrate ineffective assistance of counsel in one or more respects, which he has not, having reviewed the record in its entirety, he cannot possibly establish prejudice—*i.e.,* that but for counsel's acts or omissions there is a reasonably probability that his sentence would have been significantly less harsh given his admitted lengthy criminal history, beginning at the age of 12, his admitted years-long drug use and addiction, his admitted history of gang affiliation, and the disturbing facts of the case. *See Miller v. Dretke,* 420 F.3d 356, 364-65 & n.36 (5th Cir. 2005). Petitioner, himself, testified that he deserved no less than the death penalty. (Reporter's R., vol. 6, 179, doc. 9-15.)

Furthermore, the cumulative error doctrine necessitates reversal only in rare instances, and the Fifth Circuit has stated

27

that "the possibility of cumulative error is often acknowledged but practically never found persuasive." *United States v. Delgado,* 672 F.3d 320, 343 (5th Cir. 2012) (citing *Derden v. McNeel,* 978 F.2d 1453, 1456 (5th Cir. 1992)). A petitioner must show that (1) the individual errors involve matters of constitutional dimension rather than state law, (2) the errors were not procedurally defaulted for habeas purposes, and (3) the errors so infected the entire trial that the resulting conviction violates due process. *Derden,* 978 F.2d at 1454. *See also Coble v. Quarterman,* 496 F.3d 430, 440 (5th Cir. 2012) (rejecting cumulative error claim where the petitioner failed to identify errors of a constitutional dimension). Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised. *Westley v. Johnson,* 83 F.3d 714, 726 (5th Cir. 1996).

In summary, the state courts applied the correct legal standard and their application of the *Strickland* test was not objectively unreasonable or an unreasonable determination of the facts based on the evidence before the court and the defensive strategy at trial. A petitioner shoulders a heavy burden to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Petitioner presents no evidentiary, factual, or

legal basis in this federal habeas action that could lead the court to conclude otherwise. 28 U.S.C. § 2254(d).

## VI. CONCLUSION

The state courts' adjudication of the claims presented does not appear contrary to, or involve an unreasonable application of, federal law as determinated by the Supreme Court or based on an unreasonable determination of the facts in light of the record as a whole.

For the reasons discussed herein,

The court ORDERS that the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied and that a certificate of appealability be, and is hereby denied.

SIGNED June **2 2**, 2020.

_____
JOHN MCBRYDE
UNITED STATES DISTRICT JUDGE

29